IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KEIKO TANAKA,

       Petitioner,

v.

JACOMA MONTFORD,

       Respondent.

CIVIL ACTION FILE

NO. 1:23-CV-2580-MHC

**ORDER**

This matter is before the Court on the Verified Expedited Petition of Keiko Tanaka (the "Petition") [Doc. 3-2] filed pursuant to the Hague Convention on the Civil Aspects of International Aspects of Child Abduction ("the Hague Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001, et seq. ("ICARA"). Petitioner, a resident of Japan, filed the Petition on June 8, 2023, alleging that her husband, Respondent Jacoma Montford, has wrongfully retained their minor child, M.M., in the United States and that M.M. should be returned to Japan in order to permit Japanese courts to resolve the determination of custody arrangements.

## I.   FACTUAL BACKGROUND[1]

Petitioner was raised in Japan but came to the United States to attend college, where she met Respondent in 1997.  The two stayed in touch and were married on September 22, 2003, in Mie Prefecture, Japan.  Joint Statement of Facts ¶¶ 5, 12.  Petitioner and Respondent returned to the United States for approximately six years after they married and had their first child, Z.M., in 2006, while living in the United States.  Approximately four years later, Petitioner and Respondent moved back to Japan.  Respondent testified that the plan was for the couple to stay in Japan long enough for Z.M. to get acclimated to Japanese society and get to know his maternal grandparents, whereas Petitioner testified that the intent was to move to Japan on a more permanent basis.  However, both parties agreed that there were ongoing discussions about a potential future return to the United States.  Petitioner and Respondent testified that they purchased a home in Japan in 2011, and had their second child, M.M., who was born on August 4, 2016,

---

[1] The facts as stated in this section are derived from the parties' Joint Statement of Facts [Doc. 45], the undisputed evidence presented to the Court, and the testimony of the witnesses at the evidentiary hearing conducted by the Court on September 12, 2023.  It should be noted that Petitioner and Respondent dispute a number of facts, some of which are not material to the Court's determination, which is limited under the Hague Convention.  Where the Court has made a factual determination of a material fact that is disputed by the parties, the Court will indicate that in its discussion.

in Yokkaichi, Japan, and is a dual citizen of Japan and the United States.  Id.

¶¶ 7-8.  M.M. lived exclusively in Japan and attended school in Japan until July 27,

2022, when Respondent traveled with M.M. to Georgia.  Id. ¶¶ 8-9, 17.  M.M. has

remained in Georgia since July 27, 2022.  Id. ¶¶ 17-18.  Prior to that time, M.M.

had never traveled to the United States.  Id. ¶ 10.  The parties have stipulated that

M.M.'s habitual place of residence is Japan.  Id. ¶ 11.

Respondent testified that Petitioner was physically and verbally abusive

towards Z.M., starting when he was in the fourth or fifth grade.  Respondent

testified that Petitioner hit Z.M. on his head and back with her hands, pinched him,

threw items at him, and berated him.[2]  The parties dispute the characterization of

Petitioner's actions—Petitioner maintained that she was disciplining Z.M. for

misbehaving, while Respondent maintained that these actions amounted to abuse.[3]

Petitioner also testified that Respondent would discipline Z.M. using a belt.[4]

---

[2] Respondent testified that Petitioner called Z.M. "stupid" or "dumb" on several occasions and has told Z.M. "to die."

[3] Respondent also testified that Petitioner physically hit him on three occasions.  In response, Petitioner testified that she pushed him on his chest during arguments. The parties did not offer any testimony or evidence that these incidents occurred in the presence of their children.

[4] In his testimony to the Court, Z.M. confirmed the disciplinary actions taken by both of his parents when he was in elementary school.

Respondent contends that Petitioner has yelled at M.M. on a few occasions,

including when M.M. spilled tea on a cream-colored rug, but the parties and Z.M.

agree that Petitioner has never been physically abusive towards M.M.

Additionally, Respondent testified that Z.M. experienced bullying in school during

fourth and fifth grade because of his mixed race and contends that the Japanese

school system does not adequately acknowledge or address bullying in general.

In 2021 or 2022, Z.M. expressed a desire to attend high school in

Brunswick, Georgia, where his paternal grandparents live, and Respondent needed

to travel to Georgia to enroll M.M.'s brother for the 2022-23 school year.  Pet.

¶¶ 19-20; Answer ¶¶ 19-20.  Petitioner alleges that in July 2022, she agreed to

allow M.M. to accompany his father and brother to Georgia to meet his paternal

grandparents, "conditioned on [M.M.]'s return to Japan in September 2022."  Pet.

¶ 21.  To this end, Petitioner testified that she contacted M.M.'s schoolteacher,

advising her of M.M.'s expected absence until mid-September.  Petitioner also

testified that it was her understanding that M.M. would return to Japan by late

September.

Respondent contends that, because he purchased an open-ended ticket for

M.M., and Petitioner aided Respondent in securing copies of M.M.'s birth

certificate and vaccination records prior to M.M.'s departure, she must have been

aware that M.M. was moving to the United States. But in response to questioning by the Court, Respondent admitted that, although there were some general discussions about the potential for M.M. to stay permanently in the United States, there was no agreement between the parties from the date Respondent took M.M. to the United States until the present date that the move would be permanent. For her part, Petitioner testified that she agreed to obtain M.M.'s birth certificate and vaccination records to enable M.M. to attend school in the United States for the two months prior to the time he was to return to Japan.

The parties dispute the content of their conversations once M.M. arrived in the United States. On August 5, 2022, Petitioner sent the following text message to Respondent: "[Z.M.] said [M.M.] is not coming back. Are you serious?" Text Messages Between Pet'r and Resp't [Doc. 3 at 52-53]. On August 22, 2022, Petitioner sent another message to Respondent: "[M.M.] said he cannot come home. Daddy said he stays there. Why [did] you tell him things like that?" Id. at 53. Petitioner testified that she never agreed to allow M.M. to reside permanently in the United States, and the text messages exchanged between the parties between August and December of 2022 show that she consistently told Respondent that she wanted to see M.M. and that "[Respondent] took [M.M.] away without my agreement." Text Message Tr. Between Pet'r and Resp't [Doc. 39-1] at 2.

However, Respondent testified that, sometime in September or October, Petitioner stated during a phone conversation that she knew it was best for M.M. to remain in Georgia and proposed an arrangement wherein M.M. would return to Japan immediately for one year, or until Respondent "became settled," before going back to the United States to live permanently. Respondent said he rejected this proposal and instead offered his own "counterproposal," wherein M.M. would finish the 2023-24 school year in the United States, then go to Japan for a year, or until Respondent "became settled," before returning to the United States. Respondent further testified that he did not know Petitioner had changed her mind on M.M. ultimately residing in the United States until he received the paperwork regarding this Petition.[5] Ultimately, however, Respondent conceded that the parties never reached an agreement regarding M.M.'s permanent residency in the United States. It is also undisputed that Petitioner filed her Application for Assistance under the

---

[5] At the hearing, Respondent offered only his own testimony to support his allegation that, after M.M.'s removal to the United States, the parties discussed by phone where M.M. would reside. The text messages exchanged between the parties during the same time period belie Respondent's assertions that these conversations occurred, see generally Text Message Tr. Between Pet'r and Resp't, as does his own testimony shortly thereafter, wherein he stated that being on the phone with Petitioner invariably consisted of her crying and saying that she wanted M.M. back.

Hague Convention in late September 2022, the time when she contends M.M. was to be returned to Japan.

On April 4, 2023, Respondent filed a Complaint for Divorce with Minor Children ("Divorce Complaint") [Doc. 3 at 26-44] in the Superior Court of DeKalb County.  See Montford v Tanaka, Super. Ct. of DeKalb Cnty., No. 23FM4091 (Apr. 4, 2023).  As a part of the Divorce Complaint filed by Respondent, he submitted a "Parenting Plan Proposal" in which he suggests that he and Petitioner have joint legal custody of M.M., and that Petitioner be granted unsupervised visitation with M.M. each summer for eight consecutive weeks.  Id. at 43-44.[6] Further, Respondent checked the box in the Divorce Complaint that represented that the parenting plan proposal, "which has been completed by [Respondent], . . . will serve the best interests of our child(ren)."  Id. at 31.[7]

---

[6] The Parenting Plan Proposal also includes a handwritten note on "Exhibit A" - Visitation Schedule: "Since Mother lives in Japan, and father lives in Atlanta, Mother's visitation needs to be in big blocks of time."  Divorce Compl. at 43.

[7] Consistent with Respondent's representations in his proposed parenting plan, the Court notes that no party contends, and there is no evidence in the record to support, that Petitioner has ever harmed or threatened to harm M.M.

The parties agree that Petitioner and Respondent have joint custody of M.M., and that Petitioner was exercising her custodial rights at the time of M.M.'s removal from Japan on July 27, 2022.  Joint Statement of Facts ¶¶ 13-16.

## II.    LEGAL FRAMEWORK

The goal of the Hague Convention is to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States."  The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 1, T.I.A.S. No. 11670, 19 I.L.M. 1501, 1501.  Both the United States and Japan are contracting states to the Hague Convention.  See Joint Statement of Facts ¶ 2; see also https://travel.state.gov/content/travel/en/ International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Sept. 12, 2023).  "The [Hague] [C]onvention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004).  Through ICARA, Congress expressly found that the wrongful retention of children is "harmful to their well-being" and that a parent "should not be permitted to obtain custody" of a child by unilateral expropriation.  22 U.S.C. § 9001(a)(1)-(2).

"The [Hague] Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007). "The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." Ruiz, 392 F.3d at 1250.

> The removal or retention of a child is to be considered wrongful where –
>
> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. The rights of custody may arise by operation of law, by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the particular state. Id.

Under ICARA, 22 U.S.C. § 9003(e)(1)(A), the party seeking the child's return has the burden of showing by a preponderance of the evidence that such party was exercising custodial rights at the time of the removal and that the removal was wrongful. Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998). A petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence that: (1) the habitual residence

of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention. Chafin v. Chafin, 742 F.3d 934, 938 (11th Cir. 2013); Ruiz, 392 F.3d at 1251; Lops, 140 F.3d at 935-36.  If petitioner meets this burden, the "[c]hildren who are wrongfully removed or retained . . . are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4). The affirmative defenses enumerated in the Convention "are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return."  Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008).

Although this Court has the authority to determine the merits of the present wrongful retention claim and to return a wrongfully retained child to her country of habitual residence, this Court does not have the authority to determine the merits of the underlying custody dispute.  22 U.S.C. § 9001(b)(4); see also Lops, 140 F.3d at 936; Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993).  The focus of the Court is "whether a child should be returned to a country for custody proceedings

10

and not what the outcome of those proceedings should be." Holder v. Holder, 392

F.3d 1009, 1013 (9th Cir. 2004) (emphasis in original).  "[B]est interests of the

child are well served when decisions regarding custody rights are made in the

country of habitual residence." Abbott v. Abbott, 560 U.S. 1, 20 (2010).

## III.   DISCUSSION

The parties agree that Petitioner has established a *prima facie* case of

wrongful retention under the Hague Convention, and that M.M. is to be returned to

Petitioner in Japan unless Respondent proves one of the following two affirmative

defenses: (1) that, by a preponderance of the evidence, pursuant to the exception

contained in Article 13(a) of the Hague Convention, Petitioner consented to and/or

subsequently acquiesced in the retention of M.M. by Respondent in Georgia; or

(2) that, by clear and convincing evidence pursuant to the exception contained in

Article 13(b) of the Hague Convention, there is a grave risk that M.M.'s return

would expose him to physical or psychological harm or otherwise place the child

in an intolerable situation.  Joint Statement of Facts at 3-4.[8]

---

[8] Even if the Respondent successfully establishes one of the affirmative defenses,
the Court has discretion to order the return of M.M. to Petitioner in Japan.
Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996) ("[A] federal court
retains, and should use when appropriate, the discretion to return a child, despite
the existence of a defense, if return would further the aims of the Convention.")
(citation omitted).

**A.      Respondent Has Failed to Show, by a Preponderance of the Evidence, that Petitioner Consented or Acquiesced to M.M. Remaining in Georgia.**

Article 13(a) of the Hague Convention provides that the court is not required to order the return of the child if "the person having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention [of the child.]"  Respondent argues that Petitioner consented to M.M. moving to and remaining in the United States and does not argue that Petitioner subsequently acquiesced to M.M.'s removal from Japan, his country of habitual residence.[9]  See Resp't's Trial Br. [Doc. 42] at 3-5; see also Darin v. Olivero-Huffman, 746 F.3d 1, 14 (1st Cir. 2014) ("The consent defense involves the petitioner's conduct *prior* to the contested removal or retention, while acquiescence addresses whether the petitioner *subsequently* agreed to or accepted the removal or retention.") (quoting Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) (emphasis added)).

"The consent defense requires the retaining/removing parent to prove by a preponderance of the evidence that the petitioning parent 'consented to . . . the removal or retention.'"  Berenguela-Alvarado v. Castanos, 950 F.3d 1352, 1359

---

[9] Although Respondent testified that Petitioner agreed it would be best for M.M. to stay in Georgia, Respondent's counsel confirmed during Closing Argument that Respondent was not asserting that Petitioner acquiesced to M.M.'s permanent removal from Japan.

(11th Cir. 2020) (quoting Hague Convention, art. 13(a) and 22 U.S.C.

§ 9003(e)(2)).

> The petitioning parent's consent needn't be formal, but it is important
> to consider what the petitioner actually contemplated and agreed to in
> allowing the child to travel outside its home country.  The focus of the
> court's inquiry should be on the petitioning parent's "subjective intent,"
> and should take into account the nature and scope of the petitioner's
> consent, and any conditions or limitations on that consent.

Id. (internal quotations and citations omitted).  See also Moreno v. Martin, No.

08-22432-CIV-LENARD, 2008 WL 4716958, at *10 (S.D. Fla. Oct. 23, 2008) ("In

examining consent defenses, courts consider whether the petitioning parent

"harbored a *subjective* intent to permit the respondent to remove *and* retain the

child for an indefinite or permanent time period.") (internal quotations and

citations omitted).  "The inquiry regarding consent is 'fact-intensive' and depends

upon the Court's 'factual and credibility determinations.'" Rishmawy v. Vergara,

540 F. Supp. 3d 1246, 1282 (S.D. Ga. 2021) (quoting Padilla v. Troxell, 850 F.3d

168, 176 (4th Cir. 2017)).

In this case, Respondent argues that Petitioner consented to M.M. coming to

Georgia and residing here permanently and that it was only after Respondent and

Petitioner disagreed about the filing of their divorce that Petitioner changed her

mind.  Resp't's Trial Br. at 3-5.  Respondent argues that the parties discussed

M.M. moving to reside permanently in the United States throughout the duration of

their marriage but offers no evidence other than his own testimony in support of this argument. Id. at 4. Respondent also contends that "Petitioner even provided [M.M.]'s birth certificate and vaccination records so that the child could be enrolled in school in Georgia." Id. at 5. Respondent argued during the evidentiary hearing that a text message from Petitioner to Respondent on August 16, 2022, asking whether M.M. had been taken to the dentist was evidence of Petitioner's consent. See Text Message Tr. Between Pet'r and Resp't at 1.

Petitioner testified that she assisted Respondent in securing M.M.'s birth certificate and vaccination records because the parties both intended that M.M. attend school in the United States for approximately two months before returning to Japan.[10] Petitioner further testified that she had made arrangements with M.M.'s schoolteacher in Japan for M.M. to return to school in Japan in late September. Petitioner also offered evidence of a text message conversation with her friend, Ui, wherein she expressed her worries about M.M. "being taken away."

The consent affirmative defense "requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing

---

[10] Petitioner testified that, unlike in the United States, the summer break in Japan is only one month, from around August to September. Thus, the purported plan was to send M.M. to elementary school in the United States in August and September before he returned to Japan in September to resume his schooling there.

written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." Garcia v. Varona, 806 F. Supp. 2d 1299, 1317-18 (N.D. Ga. 2011) (quotation and citation omitted).  Respondent testified regarding proposals and counterproposals for M.M. being temporarily returned to Japan, but Respondent conceded that no formal agreement was made, or consent communicated, between the parties.  Further, Respondent testified that any alleged agreement that it would be best for M.M. to remain in the United States was made over the phone, and Respondent has failed to offer a "convincing writ[ing]" of same.  Id. at 1317.  Petitioner disputes that there was ever any agreement and offered text messages to support her testimony.

Having conceded that the parties never formally agreed to M.M.'s permanent removal from Japan, Respondent argues that the consent inquiry does not require a formal agreement, citing Berenguela-Alvarado, 950 F.3d at 1359.  As such, Respondent contends, Petitioner's statements and conduct (i.e., making sure that M.M. went to the dentist in the United States, providing M.M.'s birth certificate and vaccination records, and the fact that Respondent had not purchased a return plane ticket to Japan) demonstrate, by a preponderance of the evidence, that Petitioner consented to M.M. remaining permanently in the United States.  The Court disagrees.  The testimony presented by Respondent fails to show that

Petition had a "consistent attitude of acquiescence over a significant period of time." Garcia, 806 F. Supp. 1317. In fact, the preponderance of the evidence shows that Petitioner's "consistent attitude" was for M.M. to return to Japan and that she was surprised and disappointed when she learned that Respondent had no intention of returning M.M. in September of 2022. "[B]eyond [his] own self-serving testimony," Respondent has offered scant evidence that Petitioner consented. Id. at 1318; see also Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) ("The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention."). Accordingly, the Court finds that Respondent has not met his burden of proving by a preponderance of the evidence that Petitioner consented to M.M.'s permanent removal to the United Sates pursuant to Article 13(a) of the Hague Convention.

**B.    Respondent Has Failed to Show, by Clear and Convincing Evidence, that M.M. Faces a Grave Risk of Danger if Returned to Japan.**

Article 13(b) of the Hague Convention states:

Notwithstanding the provisions [providing a remedy of return for wrongfully removed children], the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . wh[o] opposes [the child's] return establishes that there is a grave risk that his or her return would expose the child to physical or

16

psychological harm or otherwise place the child in an intolerable situation.

The respondent opposing a child's return bears the burden of establishing the grave risk exception by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A). The respondent "must 'show that the risk to the child is grave, not merely serious.'"  Gomez v. Fuenmayor, 812 F.3d 1005, 1012 (11th Cir. 2016) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (1986)); Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes.").

"[O]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination."  Gomez, 812 F.3d at 1012 (citation and quotation omitted).  "[T]he district court is not required to also find that the home country is unable to protect the child from that grave risk of harm."  Id.  The Article 13(b) defense may not be used "as a vehicle to litigate (or relitigate) the child's best interests."  Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986).

Although there is no evidence of any prior physical abuse of M.M. by Petitioner, Respondent attempts to prove that M.M. would be at great risk of harm

17

should he be returned to Petitioner's custody by relying on his testimony regarding Petitioner's historical treatment of Z.M.  Respondent argues that evidence of Petitioner's treatment of their older child may be considered by the Court to infer that the younger child will be treated the same way when he attains a similar age. Specifically, Respondent testified that the alleged abuse of Z.M. began when Z.M. was in the fourth or fifth grade, and that M.M. had not yet been subjected to the same because of his young age.  Respondent also argues that, because M.M. is mixed race, he will experience bullying at the hands of his Japanese peers, much like Z.M. did during elementary school.  Id. at 13.  Respondent contends that both Petitioner's conduct and the atmosphere of bullying compound to create either an "intolerable situation" or a "grave risk of harm."  Id. (citing Gomez, 812 F.3d at 1012).

In response, Petitioner testified that the reason underlying her conduct was to discipline Z.M. for his misbehavior, and that Respondent also disciplined Z.M. on multiple occasions using a belt, which was confirmed by Z.M.'s testimony. Petitioner also testified that she realized her conduct towards Z.M. may have been too harsh, and that she had no intention of repeating the same conduct towards M.M.  The parties both agreed that Petitioner had never been physically abusive to M.M.

After reviewing the record and considering the testimony presented at the evidentiary hearing, the Court concludes that Respondent has failed to offer any clear and convincing "evidence directly establishing the existence of a grave risk" of harm to M.M. Van de Sande, 431 F.3d at 570. Testimony offered regarding Petitioner's prior conduct towards Z.M. creates, at worst, a speculative risk posed to M.M., which is insufficient to show that there is a grave risk of physical or emotional harm to M.M.[11] See Cunningham v. Cunningham, 237 F. Supp. 3d 1246, 1279 (M.D. Fla. 2017), aff'd, 697 Fed. App'x 635 (11th Cir. 2017) (finding

---

[11] The cases provided by Respondent's counsel during the evidentiary hearing in support of his argument that evidence of abuse may be used to determine the risk of harm posed to a sibling are clearly distinguishable. See Elyashiv v. Elyashiv, 353 F. Supp. 2d 394 (E.D.N.Y. 2005); Miltiadous v. Tetervak, 636 F. Supp. 2d 544 (E.D. Pa. 2010). In Elyashiv, the court found sufficient evidence to establish the grave risk exception as to a child who was never subject to the respondent's physical abuse where the abuse "originated as verbal disparagement . . . but evolved to physical abuse." 353 F. Supp. 2d at 399. However, in that case, the father "routinely used his belt, shoes, or hand" to hit the older children "once or twice a week," threatened to kill one of the children when the child reported an instance of abuse by his teacher, and physically abused their mother in front of them. Id. The father kept three swords and a gun in the home and threatened each family member with the weapons. Id. Similarly, in Miltiadous, the court found grave risk of harm to the children where the respondent-mother "testified credibly about extensive physical and emotional abuse she suffered throughout her marriage." 686 F. Supp. at 553-54. Both cases involved extensive physical abuse, including threats using weapons that were kept in the home. Further, both cases cited by Respondent involved the testimony of experts, who diagnosed the children with post-traumatic stress disorder.

that allegations that parent posed a grave risk to the child because she "has a

volatile personality, anger management problems and was physically abusive"

toward the child were insufficient to meet the clear and convincing evidence

standard where they were supported only by his self-serving testimony and denied

by the mother).

Respondent's evidence does not approach that contained in Taylor v. Taylor,

502 F. App'x 854 (11th Cir. 2012).  In Taylor, there were threats of future violence

by the father to the mother, including anonymous death threats made by an

unknown third party, as well as the father's continued participation in fraudulent

activities.  Taylor, 502 F. App'x at 857.  The evidence in this case is akin to

allegations made in other cases which courts found did not rise to the level of grave

risk of danger to a child under the Hague Convention.  See, e.g., Munoz v. Diaz,

No. 4:22-cv-9, 2022 WL 1093270, at *14 (S.D. Ga. Apr. 13, 2022) (finding no

grave risk of harm where the mother testified that the father threw hot water at her

face while she was pregnant, grabbed her by the neck and threw her against a wall,

and threatened the mother); Da Silva v. Vieira, 6:20-cv-1301-Orl-37GJK, 2020

WL 5652710, at *6-7 (M.D. Fla. Sept. 20, 2020) (finding that father's "history of

involvement in violent crimes, including domestic violence against the Mother in

the presence of the children," and threats to the Mother's life were insufficient to

show a grave risk of harm to the children because the "proper inquiry focuses on the risk faced by the child").

The Court also finds it compelling that there was no testimony that Petitioner caused any specific, much less serious, injury to M.M. at any point. Moreover, the Court finds it inconsistent for Respondent to contend that Petitioner poses a grave risk of serious harm to M.M., while, at the same time, he proposed a parenting plan as a part of his Divorce Complaint that contemplates Respondent keeping M.M. for eight weeks unsupervised in Japan.  Indeed, Petitioner testified that Z.M. recently visited Petitioner in Japan in the Summer of 2023 for two weeks, alone and without Respondent's supervision.

Further, Respondent failed to carry his burden in demonstrating that the potential bullying to which M.M. would be subjected amounts to an "intolerable situation."  See, e.g., Babcock v. Babcock, 503 F. Supp. 3d 862, 882 (S.D. Iowa 2020) (finding that the Defendant had not shown an "intolerable situation" where the child lacked friends in Canada, was becoming depressed, and the older children would "abuse and bully the child").  Respondent has failed to cite to any case law in support of his argument that bullying, in conjunction with the conduct of Petitioner, has been deemed sufficient to establish a grave risk exception by clear

and convincing evidence.[12]   Accordingly, the Court finds that Respondent has

failed to show by clear and convincing evidence that M.M. would be exposed to

physical or psychological harm if he returned to his place of habitual residence in

Japan with Petitioner.

Because no exception applies, M.M. must be returned to Japan, his country

of habitual residence.

### C.    Attorney's Fees and Costs

In the Petition, Petitioner requests that this Court award her all costs and

fees, including transportation costs.  Pet. ¶¶ 53-55.  With respect to the award of

attorney's fees and costs, ICARA provides, in pertinent part:

> Any court ordering the return of a child pursuant to an action brought
> under section 9003 of this title shall order the respondent to pay
> necessary expenses incurred by or on behalf of the petitioner, including
> court costs, legal fees, foster home or other care during the course of
> the proceedings in the action, and transportation costs related to the
> return of the child, unless the respondent establishes that such order
> would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

---

[12] There was also no testimony offered that the incidence of bullying in elementary
school in Japan against mixed-race students is significantly higher than that which
occurs in the United States.

Petitioner's counsel is directed to confer with Respondent's counsel in a good faith effort to resolve the issue of fees and costs prior to filing any motion.

## III.   CONCLUSION

Because the parties stipulated that Petitioner established a *prima facie* case of wrongful retention under the Hague Convention, the Court's role in this matter is limited to determining whether Respondent has demonstrated by a preponderance of the evidence that Petitioner consented to M.M. staying in the United States or by clear and convincing evidence that a "grave risk" to M.M. exists if he returns to Japan.  This Court has no legal authority over questions regarding custody or the best interests of M.M.; such questions are a matter for the country of M.M.'s habitual residence: Japan.

Based on the foregoing, this Court finds that M.M.'s habitual residence is Japan, that he was wrongfully removed by Respondent to the United States, and that no exception applies to excuse the return of M.M. to his habitual residence of Japan.  Accordingly, it is hereby **ORDERED** as follows:

(1)    The Petition of Keiko Tanaka [Doc. 1] pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act for the return of his minor child, M.M., is **GRANTED**.

(2)     The minor child M.M. shall be returned to the custody of Petitioner to be returned to his habitual residence in Japan no later than September 15, 2023, at 5:00 P.M. EDT.

(3)     Counsel for Petitioner shall coordinate with counsel for Respondent to arrange M.M.'s return of custody to Petitioner to be returned to his habitual residence in Japan in the least disruptive fashion possible.

(4)     To facilitate the return of M.M., counsel for Respondent shall promptly deliver M.M.'s travel documents to counsel for Petitioner.

(5)     Respondent shall not remove M.M., or cause M.M. to be removed, from this District until M.M.'s return to Petitioner's custody.[13]

(6)     Once M.M. is returned to Petitioner's custody, the parties' rights shall be governed under Japanese law.

This Order does not constitute a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention, which issues are left to the appropriate Japanese court with jurisdiction over those issues.

It is further **ORDERED** that Petitioner's counsel shall have up to and including September 28, 2023, to confer with Respondent's counsel and file any

---

[13] The Court emphasizes that the Court's prior Order, which permitted Respondent to travel to Brunswick, Georgia, with M.M., is no longer in effect.

24

motion to recover necessary costs and fees incurred in this action pursuant to 22

U.S.C. § 9007(b)(3).

> **IT IS SO ORDERED** this 14th day of September, 2023.

MARK H. COHEN
United States District Judge